908 So.2d 412 (2005)
Robert Eugene HENDRIX, Appellant,
v.
STATE of Florida, Appellee.
Robert Eugene Hendrix, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC04-54, SC04-1641.
Supreme Court of Florida.
July 7, 2005.
*415 Harry Brody of Brody and Hazen, P.A., Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
Robert Eugene Hendrix, an inmate under sentence of death, appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the denial of Hendrix's postconviction motion and deny his petition for a writ of habeas corpus.

*416 I. FACTS
Hendrix was found guilty of first-degree murder and sentenced to death based on the following facts.
The defendant, Robert Hendrix, broke into a house with his cousin, Elmer Scott. Scott was caught and entered into a plea agreement with the State wherein he would plead no contest to a reduced charge of simple burglary, adjudication would be withheld, and he would serve two years' community control. As a condition of the plea, Scott agreed to testify truthfully against Hendrix. Based on Scott's deposition, Hendrix was arrested and charged with armed burglary of the dwelling. The State offered a plea agreement to Hendrix wherein he would receive four years' imprisonment and five years' probation. The court date was set for August 28, 1990.
Hendrix did not want to accept a plea and told several friends prior to his court date that he was going to kill Scott to keep him from testifying. Hendrix discussed with his live-in girlfriend, Denise Turbyville, various plans to kill Scott. Hendrix also tried to secure from a number of people a "throw-away" pistol that could not be traced to him. On August 27, 1990, the day before his court date, he came home with a handgun, attempted to construct a silencer for it, and test-fired it.
At some time after 11 p.m. that night, he told Denise to get ready, that they were going to Scott's. He had a mask, gloves, and hat. She drove to the vicinity of Scott's mobile home, dropped him off, drove to the county line, and pulled over to wait. Denise heard a number of shots and then several minutes later Hendrix got in the car, saying "Don't look, just go." When they arrived home, they did not turn on the lights. Hendrix took a shower and burned his clothes out back. He gave Denise an account of the murders: He shot Elmer Scott in the head, and when Elmer's wife, Michelle, tried to fight him, he slashed her throat with a knife. He then hit Elmer over the head with the gun butt and slashed his throat "for insurance." As he shot Elmer, he swore  "I'll see you in hell!"
Hendrix was arrested and tried for the crimes. The medical examiner testified that each victim had been shot, bludgeoned, and stabbed. Several witnesses, including Denise, testified that Hendrix admitted committing the murders to silence Scott. He was convicted of two counts of premeditated first-degree murder, two counts of conspiracy to commit murder, and one count of armed burglary. During the penalty phase, Dr. Tell testified that he interviewed Hendrix and found him to be in the middle range of intellectual functioning, with no learning disability or psychosis but harboring feelings of anger and aggression. Dr. Paskewicz testified that Hendrix's anger and aggression may have been caused by beatings at the hands of his father. His father testified that Hendrix worked hard as he was growing up. His sister testified that the father had a bad temper, had been hard on the boys, and had beat them with belts. A second sister testified that Hendrix was a good brother and wonderful uncle to her daughter.
Hendrix v. State, 637 So.2d 916, 917-18 (Fla.1994). The jury convicted Hendrix of conspiracy, armed burglary, and two counts of first-degree murder and unanimously recommended a sentence of death for each murder. Judge Jerry Lockett, the presiding judge, followed the jury's unanimous recommendation and imposed a death sentence for each murder, finding *417 five aggravating circumstances[1] and several nonstatutory mitigating circumstances.[2]
On direct appeal to this Court, Hendrix raised nine claims.[3] The State cross-appealed, contending that the trial court erred in refusing to allow the State to present as an aggravating factor the fact that Hendrix had a prior conviction for a violent felony as a juvenile. This Court rejected all of Hendrix's arguments except for his argument relating to his conviction for conspiracy to murder Michelle Scott. The United States Supreme Court denied Hendrix's petition for a writ of certiorari. Hendrix v. Florida, 513 U.S. 1004, 115 S.Ct. 520, 130 L.Ed.2d 425 (1994).
Hendrix filed a timely motion for post-conviction relief, which he later amended, and raised twenty-five claims. Judge Lockett summarily denied several of his claims and granted an evidentiary hearing for claims 4, 12, and 24. He deferred ruling on nine of the claims until after the hearing. Prior to the evidentiary hearing, Judge Lockett retired, and Judge Law was assigned to the case. Hendrix requested an opportunity to depose Judge Lockett and the codefendant's attorneys. Hendrix later moved to disqualify Judge Law, which the court granted, and Judge Hill was assigned to the case. Judge Hill allowed Hendrix to depose Judge Lockett but only relating to whether Hendrix's shackles were visible to the jury.
A multi-day evidentiary hearing was held at which counsel presented evidence regarding: (1) mitigation evidence that could have been presented by lay witnesses, including information regarding Hendrix's significant drug abuse problems from a very early age, the emotional and physical abuse he suffered at home, and a head injury he sustained; (2) mitigation evidence that could have been presented by mental health experts; (3) undisclosed information relating to the fact that trial witness Roger LaForce had a prior record of being a confidential informant; (4) expert testimony that would have challenged whether the HAC aggravator was present; (5) evidence that Hendrix was shackled during the trial; and (6) ineffective assistance of counsel.
*418 During the evidentiary hearing, twenty-three witnesses testified. First, Hendrix's counsel presented numerous family members and friends who testified that Hendrix had a significant drug abuse problem which began at a very early age. Many witnesses also testified regarding the emotional and physical abuse Hendrix suffered at home, and his family testified that Hendrix was once hit in the head.
Next, counsel presented evidence to show that one of the State's witnesses at trial, Roger LaForce, had been a confidential informant with a drug task force for a brief period of time prior to his involvement in this caseinformation about which defense counsel alleged they were not informed. Counsel also presented the testimony of two mental health experts to show that experts could have testified to certain statutory mitigators. Dr. Barry Crown, a licensed psychologist, testified that based on testing, he believed that Hendrix had frontal lobe brain damage at the time of the murders. Dr. Jonathan Joseph Lipman, a neuropharmacologist, testified that the drugs Hendrix abused had significant effects on his brain and his behavior. He stated that Hendrix suffered from paranoid projection, meaning that he saw nonthreatening things to be threatening. Moreover, based on the types of drugs he took and the reactions he had from them, he also could have been suffering from the rare effects of "benzodiazepine rage." Dr. Lipman further asserted that any frontal lobe damage to the brain would make Hendrix even more vulnerable to benzodiazepine rage. The State presented one witness to rebut Hendrix's evidence regarding whether this mitigation applied: Dr. Harry McLaren, a forensic psychologist, who believed that no statutory mental-health mitigation applied. While Dr. McLaren did not disagree with Dr. Crown that there could be some mild degree of brain damage, he did not believe that Hendrix was under the influence of an extreme emotional disturbance because the evidence showed that Hendrix went through a very detailed plan to prevent leaving evidence.
Hendrix's counsel presented evidence from Dr. Willey, a physician and a pathologist, who disagreed with some of the medical examiner's testimony as to whether HAC applied. Postconviction counsel also called Judge Lockett and Arthur Newcombe, a bailiff from Hendrix's trial, to establish that Hendrix was shackled during the trial. Both testified that the jurors never would have been able to see the shackles and that they both were aware that Hendrix had been suspected of planning an effort to escape. Counsel called other attorneys who were present during the trial, but none had any specific recollections of hearing Hendrix's chains when the jury was present.
Donald Eisenberg, an investigator for Hendrix, testified as to his involvement in the case, including his interviews of Chris Wood, Lisa Allen, Tony Drennan, Hendrix's parents, and Hendrix's two sisters. He also obtained transcripts from Hendrix's prior schools, obtained records from the prison, and delivered a packet of information to Hendrix's mental health doctor. Finally, collateral counsel called trial defense counsel, Thomas Turner, who is currently a circuit judge in the Ninth Judicial Circuit of Florida. During Turner's representation of Hendrix, Turner learned that Hendrix had been examined by Dr. Krop, but Turner made a strategic decision not to call him because Dr. Krop believed that the murders were cold, calculated acts that were not the result of any mental illness or defect. Moreover, this decision would prevent the jury from hearing the details of the crime, since Turner believed that if the jury heard the details, they would not "buy a psychiatric defense" or any defense at *419 all. As to the penalty phase, Turner did not want to present evidence regarding Hendrix's voluntary use of drugs and alcohol because he did not believe that to be a viable defense in light of the fact that Hendrix was clear-headed when he committed the murder. Further, he did not want to mention drug use because he did not want to alienate the jurors, who he believed were "very conservative." Instead, he chose to present the argument that Hendrix had a lot of problems and was crying out for help, but that the help that he needed was never provided to him. Turner did concede the HAC aggravator because the evidence was clear that it was an extremely brutal murder.
In an extremely thorough order, the postconviction court denied the remaining claims in Hendrix's postconviction motion. Hendrix appeals this order and further has filed a petition for a writ of habeas corpus.

II. RULE 3.850 APPEAL
Hendrix raises four claims: (1) whether the postconviction court erred in denying his claim that newly discovered evidence concerning witness LaForce and Judge Lockett demonstrates that Hendrix was denied a neutral and impartial judge; (2) whether the postconviction court erred in holding that shackling did not deny Hendrix his right to a fair trial; (3) whether the postconviction court erred in denying relief on Hendrix's ineffective assistance of counsel claims; and (4) whether the postconviction court erred in denying relief on the claim that the State failed to disclose Brady[4] information relating to witness LaForce. We summarily dispose of his first claim because this issue has not been properly preserved for this Court to rule upon.[5]
In the first issue that we address, Hendrix contends that his trial counsel was ineffective in both the guilt phase and the penalty phase. In order to prove that counsel was ineffective, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that counsel's deficient performance prejudiced his defense, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. As this Court has held, "[i]neffective assistance of counsel claims are mixed questions of law and fact, and are thus subject to plenary review based on the Strickland test. Under this *420 standard, the Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings." Hodges v. State, 885 So.2d 338, 346 (Fla.2004) (citation omitted).
First, Hendrix alleges that his counsel was ineffective because he failed to object to the relevance of Juan Perez's testimony that Perez saw a blond man leave the crime scene, especially in light of the fact that Perez could not say the man he saw was the defendant. Hendrix provides no explanation as to how a witness's statement regarding the description of a person leaving the crime scene could be excluded from the trial based on relevancy simply because the witness did not state explicitly that he saw Hendrix. Relevant evidence is defined as "evidence tending to prove or disprove a material fact." See § 90.401, Fla. Stat. (2004). Describing a person leaving a crime scene would clearly be relevant since it would be either consistent or inconsistent with the person accused of the crime. In fact, Hendrix's original trial attorney asserted that he did not object because it furthered his trial strategy in establishing reasonable doubt, particularly since the description did not match Hendrix. We find no error in the postconviction court's conclusion that Hendrix failed to demonstrate that his counsel was ineffective or that he suffered any prejudice from this alleged deficiency. Therefore, Hendrix is not entitled to relief on this claim.
Next, Hendrix asserts that his counsel was ineffective because he did not discover LaForce's history of working as an informant for the State and thus did not impeach LaForce on this basis. The testimony elicited during the evidentiary hearing shows that LaForce's activity as an informant began and ended a significant time before the instant trial and was conducted only for the drug task force team. Again, Hendrix has failed to provide any argument as to how his counsel was deficient in failing to discover this evidence. Moreover, he has failed to show how he was prejudiced by this "deficiency" since the jury was clearly aware that LaForce was in jail at the time and that LaForce contacted the State himself, asking for a deal. Any impact relating to this prior involvement as a confidential informant would have had a minimal effect when compared to LaForce's recent attempt to receive benefits by coming forward with Hendrix's in-jail confession. As we find no error in the postconviction court's conclusion that Hendrix failed to show prejudice, we deny this claim.
Hendrix also contends that his counsel was ineffective in "failing to show the link between Judge Lockett and the prosecution to a witness." Besides this conclusory allegation, Hendrix completely fails to show how his counsel was ineffective or how he was prejudiced by counsel's failure to discover that the trial judge had previously accepted a plea from LaForce in a completely unrelated case. As Hendrix has failed to meet his burden, we deny this claim.
Next, Hendrix contends that his counsel was ineffective in failing to present: (1) testimony from his family and friends concerning his drug addiction, physical abuse at home, the impact of the death of his brother, and the head trauma he suffered; and (2) testimony from expert witnesses regarding Hendrix's brain damage, the effect of drugs on his brain, and statutory mitigators. The postconviction court denied these claims after first noting that most of the claims were "Monday morning quarterbacking" that simply disagreed with trial counsel's strategies:

*421 The instant case is like Banks [v. State, 842 So.2d 788 (Fla.2003),] in that trial counsel herein also consulted with a mental health expert, Dr. Krop, a forensic psychologist. Dr. Krop interviewed the Defendant after his arrest. According to trial counsel, when he consulted with Dr. Krop, the doctor told him that during his interview with Mr. Hendrix, Mr. Hendrix disclosed, in cold, clear detail, how and why he had murdered the victims. Dr. Krop advised counsel that these were cold, calculated acts that were not the result of any mental defect; that Mr. Hendrix was in clear command of his faculties at the time of the offenses; and that Mr. Hendrix made a clear, conscious decision to kill because he did not want to go back to prison. Interestingly, the jury reached the same conclusions as Dr. Krop, and these good folks did so without the advantage [of] going to medical school. Further, Dr. Krop indicated he could offer no professional opinion that would be helpful. The recitation of the events of the murders as told to Dr. Krop comported with the description and admission the Defendant had made to trial counsel. Like the trial attorney in Banks, Judge Turner wisely made a strategic decision not to call Dr. Krop at trial. The Supreme Court has denied defendants relief where counsel consulted with a mental health expert, but made a strategic decision not to present such evidence. Rose v. State, 617 So.2d 291, 294 (Fla.1993) (ineffective assistance of counsel claim denied where a psychologist determined the defendant had an antisocial personality disorder, but not an organic brain disorder, and counsel conduct[ed] no further investigation).
. . . .
Collateral counsel faults trial counsel for not presenting evidence that Mr. Hendrix was substantially impaired and acting under extreme disturbance as contemplated in Florida Statute § 921.141, by showing Mr. [Hendrix] has some brain damage and the combined effect of his abuse of alcohol and diazepam with the frontal lobe damage created a condition referred to as Benzodiazepine rage. To support this theory, Dr. Lipman, a neuropharmacologist, and Dr. Crown, a licensed psychologist, were called at the evidentiary hearing. Dr. Lipman testified that using alcohol and diazepam, or more potently, a combination of the two, can produce disinhibiting effects. A subject, like Mr. Hendrix, who also has frontal lobe damage, (as determined by Dr. Crown) tends to be more impulsive and perservating [sic], and the drugs magnify this effect. Dr. Lipman testified that Mr. Hendrix was one of the anomaly subjects that exhibit a seething rage when taking the diazepam rather than the tranquil, calming effect for which it is therapeutically prescribed. . . .
Dr. Crown testified regarding the Defendant's alleged brain damage. Dr. Crown examined the Defendant seven years after the offenses and determined that the Defendant was afflicted with frontal lobe damage. This type of damage, according to Dr. Crown, causes impaired executive functioning. Executive functioning involves reasoning, judgment, impulsivity and control of impulsivity. It also involves conceptual flexibility or the ability to shift smoothly from one concept to another. It was Dr. Crown's opinion that not only was Mr. Hendrix suffering from frontal lobe damage at the time of the interview, (seven years after the murder) but that nothing indicated newly inflicted trauma, so the Defendant was suffering from the frontal lobe damage at the time of the murders. Dr. Crown opined that the *422 Defendant was under the influence of extreme mental or emotional disturbance at the time of the murders and that his ability to conform his conduct to the requirements of the law was substantially impaired at the time of the murders. Compare this to the Defendant's cold, detailed description of the planning and execution of these murders he made to Dr. Krop.
There was no indication that Mr. Hendrix's self-reported abuse of diazepam was made known to trial counsel before or during the penalty phase. Further, Mr. Hendrix had been examined by one psychologist several years before the murder, and two more psychologists saw him between the time of the murders and trial. There is no evidence that these evaluations ignored any clear indications of mental health problems or brain damage. "This case is similar to Jones, where the defendant had been examined prior to trial by a mental health expert who gave an unfavorable diagnosis. As we concluded in Jones, the first evaluation is not rendered less than competent `simply because appellant has been able to provide testimony to conflict' with the first evaluation." Asay v. State, 769 So.2d 974, 985-86 (Fla.2000) (quoting Jones v. State, 732 So.2d 313, 320 (Fla.1999)). As quoted in Banks, the new opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. Herein, only one doctor has determined Mr. Hendrix suffers from frontal lobe damage, and his examination took place seven years after the murders. The neuropharmacologist based his opinion on the Defendant's self reported drug use. There is nothing in the record to corroborate the use of diazepam on the night of the murders.
Finally, Judge Turner, while unaware of the Defendant's Valium use, was aware the Defendant had a history of other drug use. When asked if he made a decision about whether to present that evidence to the jury, he stated, "The decision was that Lake County jurors, being very conservative, I did not feel that they would  that to bring up prior drug use would probably alienate them more towards the Defendant, as opposed to make them favorably disposed toward him. . . . In listening to his explanation of what he did and why, he did it, it was clear to me that it wasn't caused by the drugs, that his judgment wasn't impaired by drugs. He had poor judgment, obviously, but that it was a very well-thought out, calculated decision and I didn't think that we would get anywhere, that we would lose ground as opposed to gain ground by presenting evidence of drug use and trying to justify that as a basis for the homicide."
Based upon the foregoing, the Court finds counsel was not ineffective for failing to retain the services of a mental health expert to testify to Mr. Hendrix's brain damage and drug and alcohol abuse. Further, counsel was not ineffective for presenting the testimony of Dr. Tell at trial. These were strategic decisions, made upon thorough investigation and within the norm of professional standards. Finally, even if the new opinion evidence had been presented as the Defendant now wishes, the Court does not find that the new testimony would have in anyway changed the result in this case in light of the "[v]ast evidence adduced showing that the murders were executed with heightened planning and premeditation." Hendrix v. State, 637 So.2d 916, 920 (Fla.1994).
State v. Hendrix, No. 90-1297-CF (Fla. 5th Cir. order filed Dec. 11, 2003). The fact that Hendrix has now found mental *423 health experts who have more favorable testimony does not invalidate the testimony of the mental health experts that his counsel relied upon during the penalty phase. See Asay v. State, 769 So.2d 974, 985-86 (Fla.2000). Moreover, in Pace v. State, 854 So.2d 167, 173-74 (Fla.2003), this Court rejected a claim that counsel was ineffective for making a strategic decision not to present evidence regarding drug usage. In this case, counsel was well aware that Hendrix carefully and coldly planned the murders, evidence which is contrary to the current testimony that Hendrix's drug usage caused him to be substantially impaired at the time of the crimes. Counsel cannot be considered ineffective for failing to present evidence of drug usage, particularly in light of the other evidence which showed that Hendrix was quite capable of reasoning. There is competent, substantial evidence to support the postconviction court's factual findings, and Hendrix has failed to show that the lower court made any legal errors in its conclusions regarding prejudice. Thus, we deny this claim.
In the final ineffective assistance claim, Hendrix alleges that his counsel was ineffective in failing to secure an independent medical examiner who could challenge Dr. Leal's testimony concerning the heinous, atrocious, and cruel aggravator. In support of this claim, Hendrix called Dr. Edward Willey, a forensic pathologist and past medical examiner, to testify at the evidentiary hearing. Dr. Willey never stated that the deaths were not heinous, atrocious, and cruel. Instead, he merely disagreed with whether Dr. Leal's opinion was opinion or fact, concluding that many of the statements Dr. Leal made during the original trial could not be proven absolutely. For example, Dr. Willey stated that Dr. Leal merely speculated that the wounds on Michelle Scott's arms were defensive wounds but later stated that this was a reasonable speculation. Dr. Willey presented no evidence to show that the victims died quickly or were rendered unconscious immediately. While he disagreed as to the exact manner in which Elmer Scott died, Dr. Willey also characterized any errors in the medical examiner's conclusions as harmless errors that would not make much difference. We find no error as to the postconviction court's conclusions that Hendrix failed to show ineffective assistance and failed to demonstrate prejudice. Thus, this claim is likewise denied.
Next, Hendrix contends that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it failed to disclose that one of the witnesses was a confidential informant for the State. In order to establish a Brady violation, a defendant must demonstrate "(1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice." Sochor v. State, 883 So.2d 766, 785 n. 23 (Fla.2004). As this issue presents mixed questions of law and fact, this Court will defer to the factual findings made by the trial court so long as they are supported by competent, substantial evidence, but review de novo the application of the law to those facts. Id. The postconviction judge denied the claim as follows:
During the guilt phase of the Defendant's trial, the State presented the testimony of a jailhouse snitch. This witness, Roger LaForce, was privy to certain statements about the murders, made by the Defendant, including an admission that the Defendant had made sure the police would only have a circumstantial case, and that he had tried to make the murders look like a revenge *424 killing because the wife was an informant for the Sheriff's office.
The Defendant's post conviction claim is that the State failed to provide him with exculpatory or impeachment evidence when it failed to disclose that Roger LaForce had a history as a confidential informant and was given favorable treatment in exchange for his testimony. To the extent the claim alleges that Mr. LaForce was treated favorably or given anything in exchange for his testimony at the Defendant's trial, this is refuted by the record. The transcript reflects Mr. LaForce did not receive anything in exchange for testifying. . . . No evidence was presented at the evidentiary hearing to contradict this. However, it does appear that Mr. LaForce had previously been involved with the State attorney's office as a cooperating defendant.
Noel Griffin, a special agent with the Florida Department of Law Enforcement, testified that from 1986 until 1989 he headed a narcotics task force in Lake and Sumter Counties. Sometime during that period, the task force had made a case against Roger LaForce, and in the hope of substantial assistance with his own case, Mr. LaForce agreed to assist the task force with additional investigations. Mr. Griffin did not know to what extent, if any, . . . Mr. LaForce actually received assistance with his case. He could not recall on how many cases Mr. LaForce cooperated, and had no recollection of telling the prosecutors in the Defendant's case that Mr. LaForce was a cooperating defendant. Mr. Griffin further testified that once Mr. LaForce had been sentenced, his relationship with law enforcement would have ended. The records show that Mr. LaForce was arrested in 1987 and sentenced in February of 1988. The Defendant was arrested in August of 1990, and his trial commenced in September of 1991.
The prosecutor, Bill Gross, was also called to testify during the evidentiary hearing. It was the prosecutor's testimony that he did not know that Mr. LaForce had ever been an informant, or cooperating defendant, when Mr. LaForce testified at the Defendant's trial. The prosecutor only became aware of the fact during the post conviction proceedings when Mr. Hendrix's counsel made the allegations.
. . . .
Herein, information regarding Roger LaForce's prior cooperation with the Lake County drug task force should have been disclosed as impeachment evidence favorable to the Defendant. However, in the context of the entire record, this information would not likely have put the case "in such a different light as to undermine confidence in the verdict." Mr. LaForce testified that he was receiving nothing and gained nothing from testifying in the Defendant's trial. That he had previously received some benefit for cooperating with law enforcement may have been used to impeach Mr. LaForce's testimony, but even without the defense being aware of this information, Mr. LaForce admitted he hoped the State attorney's office would cut him a deal for coming forward with the information.
Order at 3-4. The court correctly determined that this was impeachment evidence that should have been disclosed. Hendrix does not challenge the findings of fact; nor does he contend that the postconviction court applied the law incorrectly. Instead, he disagrees with the lower court's conclusions because he believes the withheld information was more important than the judge concluded. Hendrix, however, has failed to show that the postconviction court *425 erred in concluding no prejudice occurred. LaForce's prior assistance as a cooperating defendant, which occurred over a year prior to Hendrix's arrest, would have had a minimal impact, if any. The more damaging evidence regarding LaForce, that he heard the confession while in prison and contacted the State because he was seeking a deal, had already been presented to the jury. Thus, Hendrix is not entitled to relief on this claim.
In his last remaining postconviction claim, Hendrix argues that his constitutional rights were violated by the court's actions in physically restraining him through the use of shackles without first making any findings that shackles were absolutely necessary to further a State interest and were the least prejudicial method of restraint.[6] To the extent that Hendrix claims his counsel was ineffective for failing to object, this Court can review such claims. See, e.g., Sims v. State, 602 So.2d 1253, 1256 (Fla.1992) (addressing on the merits whether counsel was ineffective for failing to object to restraints used during trial); Marquard v. State, 850 So.2d 417, 431 (Fla.2002) (same).
The postconviction court found the relevant facts as follows.
At the evidentiary hearing Judge Lockett, the Judge who presided over the trial, and Art Newcombe, the bailiff in charge of security during the Defendant's trial, as well as the testimony of various attorneys and even a witness who was present at the trial all testified that the jury would not have been able to see Mr. Hendrix's shackles. Further, Mr. Newcombe testified that he was aware, prior to trial from the deputies at the Lake County Jail, that a shank made from an air conditioning louver was found in the Defendant's cell approximately two and a half months before the trial. He also said that about a month after finding the shank, Mr. Hendrix asked [one] of the cleanup men at the jail to get him a louvered slat from an air conditioning unit. The Defendant had also been implicated in an escape plot with another prisoner, just three weeks before trial.
The Court finds that the shackling of Mr. Hendrix was necessary in this case, and that no prejudice has been demonstrated by the Defendant because of his shackling. The Defendant was seated behind counsel table where his feet would be shackled to the table by an anchor near the floor. The table has a floor length façade on the front and both sides.
Order at 22. Hendrix has not met either of the Strickland prongs. First, he failed to show that his counsel's performance was deficient for not objecting to shackling. It is highly unlikely that objecting to the shackles would have produced any results, particularly where both the judge and the bailiff knew that Hendrix was an escape risk and was found with a weapon in his cell. Moreover, the court undertook very careful methods to ensure that the jury was not aware of the shackles. Second, Hendrix has failed to show any prejudice. As the postconviction court found, all witnesses testified that the shackles were not visible to the jury, and no testimony was presented to show that the jury or anybody else even heard Hendrix's shackles during the trial. As there is competent, substantial evidence to support the postconviction court's factual findings and, further, *426 as Hendrix has failed to show that the court erred relative to its legal conclusions, we deny this claim.

III. HABEAS CORPUS PETITION
In his sole petition for a writ of habeas corpus claim, Hendrix contends that his appellate counsel was ineffective for failing to raise the shackling claim on direct appeal. First, appellate counsel may not be deemed ineffective for failing to challenge an unpreserved issue on direct appeal unless it resulted in fundamental error. See Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000). Moreover, Hendrix has failed to allege any fact to show that his appellate counsel was even aware that Hendrix was shackled during the trial. As noted above, evidence from the postconviction proceedings establishes that Hendrix was shackled solely because that was the trial court's unspoken policy as to all criminal defendants. Defense counsel never objected to the shackling issue with the trial court, so there would be no information in the record as to whether Hendrix was shackled during the trial. All of the information that Hendrix relies upon in raising this issue comes from testimony that was elicited during the postconviction evidentiary hearing. Neither party cites to any portion of the record from the original trial proceedings where shackling was discussed. Accordingly, this Court would not be able to confirm whether Hendrix was indeed shackled at his trial until after such matters were established in a postconviction proceeding. As this Court has held, appellate counsel is not considered ineffective for failing to present evidence which was outside of the appellate record on review. Rutherford, 774 So.2d at 646. Since this Court would not be able to address such a matter on direct appeal, we deny this claim.

IV. CONCLUSION
Accordingly, we affirm the postconviction court's denial of Hendrix's rule 3.850 motion for postconviction relief and deny his petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The following aggravators were found: (1) Hendrix committed the murders in a cold, calculated, and premeditated manner (CCP); (2) the murders were committed by Hendrix to avoid lawful arrest; (3) he committed the murders in the course of an armed burglary; (4) the murders were committed in an especially heinous, atrocious, or cruel manner (HAC); and (5) Hendrix had been convicted of a prior capital felony.
[2] The following nonstatutory mitigating circumstances applied:

The Defendant's family history, juvenile history, and close relationship with his mother and sisters, as well as the sentence of his co-defendant herein, Alma Denise Turbyville, to seventy-five (75) years in the Department of Corrections as a result of her plea negotiated with the State in return for her cooperation herein, give rise to non-statutory mitigating circumstances, which have been given weight by this court.
Hendrix, 637 So.2d at 918 n. 2.
[3] On appeal, Hendrix claimed the trial court erred by: (1) denying his motion to disqualify the judge; (2) denying his motion to strike the jury panel on the grounds that the selection process resulted in under-representation of African-Americans; (3) denying his motions for mistrial on the basis of allegedly improper comments made during the opening and closing statements; (4) denying his motion for mistrial based on the prejudicial effect of the emotional outburst by the victim's father; (5) permitting the admission of inflammatory photos of the victim; (6) denying his motion for judgment of acquittal on the conspiracy counts; (7) failing to give limiting instructions on the aggravating circumstances of HAC and CCP; (8) failing to hold that Florida's death penalty statute is unconstitutional; and (9) failing to hold that the aggravating factor of HAC is unconstitutionally vague.
[4] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[5] As we have previously stressed, "[i]n order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court." Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987). Because Hendrix failed to present this specific claim below, it is procedurally barred.
[6] The State contends that this claim is procedurally barred because it should have been addressed on direct appeal. We have addressed this issue below, in handling Hendrix's sole habeas claim: whether appellate counsel was ineffective for failing to raise the shackling claim on direct appeal.