[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 13, 2008
THOMAS K. KAHN
CLERK

————————————

No. 07-13117

————————————

D. C. Docket No. 06-00267-CV-OC-10GRJ

ROBERT HENDRIX,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF
CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents-Appellees.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

(May 13, 2008)

Before TJOFLAT, CARNES and HULL, Circuit Judges.

PER CURIAM:

Robert Hendrix and his cousin, Elmer Scott, were charged with burglary. Hendrix v. State (Hendrix I), 637 So. 2d 916, 917 (Fla. 1994). Scott agreed to testify against Hendrix in exchange for a reduced charge. Id. To prevent him from testifying, Hendrix brutally murdered Scott on the eve of the trial. Id. at 918. He also brutally murdered Scott's wife who had the misfortune of being present when her husband was killed. Id.

As a result of the crimes, Hendrix was convicted of two counts of premeditated first-degree murder, two counts of conspiracy to commit murder, and one count of armed burglary. Id. at 918. He was sentenced to thirty years on each of the conspiracy counts and life on the armed burglary count. Id. The jury unanimously recommended a death sentence for each murder conviction, and the trial judge followed that recommendation. Id. On direct appeal, the Florida Supreme Court reversed one of the conspiracy convictions and the sentence that went with it, but the Court affirmed the remaining convictions and sentences. Id. at 921. The United States Supreme Court denied Hendrix's petition for a writ of certiorari. Hendrix v. Florida (Hendrix II), 513 U.S. 1004, 115 S. Ct. 520 (1994). Following an evidentiary hearing at which twenty-three witnesses testified, Hendrix v. State (Hendrix III), 908 So. 2d 412, 418 (Fla. 2005), the state trial court

issued a detailed order denying Hendrix's Rule 3.850 state collateral challenge to his convictions and sentences.  Id.  That denial was affirmed by the Florida Supreme Court, which also denied a petition for a state writ of habeas corpus that Hendrix had filed.  Id. at 426.

Hendrix then filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida.  Hendrix v. McDonough (Hendrix IV), No. 5:06-cv-267-Oc-10GRJ, 2007 WL 1303034, at *1 (M.D. Fla. May 3, 2007).   Although that court denied the petition, id. at *6, it did issue a certificate of appealability permitting Hendrix to appeal to this Court three of the issues he had raised.  Hendrix v. McDonough (Hendrix V), No. 5:06-cv-267-Oc-10GRJ, slip opinion. at 3 (M.D. Fla. Aug. 13, 2007).  This is that appeal.

The first issue before us involves the refusal of Judge Jerry Lockett, who presided over the state trial and sentence proceedings, to recuse or disqualify himself (we use the terms "recuse" and "disqualify" interchangeably because the Florida Supreme Court did so in its opinion, see Hendrix I, 637 So. 2d at 919–20 & n.3–5).  Hendrix filed a motion raising this issue at the trial.  Although the trial judge denied the motion, he did allow Hendrix to put on evidence about the matter to perfect the record for purposes of appeal.  Id. at 919.  Hendrix did so.  Id.  We

will not repeat here the facts relating to this issue, which are adequately set out in the Florida Supreme Court's direct appeal opinion. See id.

The certificate of appealability granted for this issue focused on whether by failing to recuse himself Judge Lockett violated the rule announced in Gardner v. Florida, 430 U.S. 349, 97 S. Ct. 1197 (1977), Hendrix V, No. 5:06-cv-267-Oc-10GRJ, slip opinion. at 3, which prohibits a judge from making a capital sentencing decision based on information not disclosed to the defendant. Gardner, 430 U.S. at 362, 97 S. Ct. at 1207. Because of the standard set out in 28 U.S.C. § 2254(d), the actual issue for us is whether the Florida Supreme Court's decision that there was no Gardner violation "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). It was not and did not.

There is no Gardner violation unless the judge is both aware of, and actually considers in sentencing, information that is not disclosed to the defendant. Gardner, 430 U.S. at 358, 97 S. Ct. at 1205. Unlike the sentencing judge in Gardner, the one in this case did not state that he was considering confidential information. Compare id. at 353, 97 S. Ct. at 1202, with Hendrix I, 637 So. 2d at 920. Instead, "the judge here said just the opposite—that his findings were based

4

solely on proof presented 'during the guilt and penalty phase of the trial.'" Id. The Florida Supreme Court's finding of fact that Judge Lockett did not consider any confidential information in sentencing Hendrix is not "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Hendrix had a full and fair opportunity to present any evidence he wished on the Gardner issue at the hearing that was held during the trial for purposes of perfecting the record on appeal. At that hearing Hendrix called as a witness the attorney for his co-defendant, the lawyer whom Lockett had briefly advised before he became a judge. Hendrix did not, however, ask her what she had told Lockett or, more specifically, whether she had told Lockett anything relevant to Hendrix's sentencing. The burden was on Hendrix to prove his claimed violation, see Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001); Delap v. Dugger, 890 F.2d 285, 311 (11th Cir. 1989); cf. Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc), and he has failed to do so. The Florida Supreme Court's decision on this issue is entirely in keeping with the Gardner decision.

Hendrix also contends that Judge Lockett's refusal to recuse himself violated Hendrix's due process right to a fair and impartial judicial officer. It is not clear that this issue is within the COA, but even if it is the issue is not one on

5

which Hendrix can prevail. To the extent that Hendrix argues recusal or disqualification was required under Florida statutory law or its Code of Judicial Conduct, the Florida Supreme Court held to the contrary, Hendrix I, 637 So. 2d at 919–20, and we are bound by its interpretation of state law, Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 604 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). In any event, a violation of state law is not a ground for federal habeas relief. Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . ."); Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 875 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

The Florida Supreme Court stated that Hendrix "does not claim, nor has he ever claimed, that the judge was biased in any way." Hendrix I, 637 So. 2d at 919. There is no evidence at all in the record of any bias. The absence of any evidence of bias, and Hendrix's failure to even claim bias while pursuing this claim in the state courts, bar him from asserting here that the trial judge was biased. Although it is not entirely clear, Hendrix apparently contends that the Constitution requires disqualification or recusal of even an unbiased judge if there is an appearance of

6

bias and partiality. Putting aside the question of whether there was such an appearance in this case, there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision.

Our circuit law runs to the contrary. In Davis v. Jones, 506 F.3d 1325 (11th Cir. 2007), the habeas petitioner contended that his due process rights were violated because the juvenile court judge presiding over one of the hearings in his case was the brother of one of the prosecutors. Davis, 506 F.3d at 1326. No actual bias was shown. Id. at 1331. Instead, the petitioner contended that the appearance of partiality—the fact that the judge's impartiality might reasonably be questioned in those circumstances—was enough to make out a due process violation. Id. After surveying Supreme Court decisions in this area, and noting that this Court and at least two other circuits had held that an appearance of bias is not enough to violate the Due Process Clause, id. at 1333–35, we concluded that the state courts' rejection of the petitioner's contention was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, id. at 1337. The same is true in this case.

The district court also granted a COA on the issues of whether Hendrix's trial counsel rendered ineffective assistance at the guilt and sentence stages.

Hendrix has abandoned his guilt stage ineffective assistance of counsel claims by failing to raise them in his brief to us. See Fed. R. App. P. 28(a)(5), (9); Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004); Adler v. Duval County Sch. Board., 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997). He has continued to raise his penalty stage ineffectiveness claims.

The Florida trial court conducted an extensive evidentiary hearing on Hendrix's penalty stage ineffective assistance claims, and after hearing testimony from numerous witnesses, including trial counsel, issued an order thoroughly discussing the claims and denying them. Hendrix III, 908 So. 2d at 417–18. In affirming, the Florida Supreme Court repeated and adopted the trial court's findings and discussion and added some of its own. Id. at 420–23.

It is, of course, clearly established by Supreme Court decisions that in a capital case "counsel has a duty to make reasonable investigations" into the existence of mitigating circumstances, "or to make a reasonable decision that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting Strickland v. Washington, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066 (1984)); see also Williams v. Taylor, 529 U.S. 362, 395–96, 120 S. Ct. 1495, 1514–15 (2000). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that

8

reasonable professional judgments support the limitations on investigation," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Wiggins, 539 U.S. at 521–22, 123 S. Ct. at 2535 (quoting Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066).

After carefully considering the evidence presented in the guilt and penalty stages of Hendrix's trial, and in his state collateral proceeding, the Florida Supreme Court decided that trial counsel's investigation and presentation of mitigating circumstances were reasonable. Hendrix III, 908 So. 2d at 420–23. That decision is not an unreasonable application of Wiggins, Williams, or any other Supreme Court precedent.

We add a comment about an aspect of one of the ineffective assistance claims. Hendrix produced at the state collateral proceeding mental health experts who testified that they would have appeared on his behalf at the penalty stage of Hendrix's trial. The emergence of such witnesses is not at all unusual. It happens a lot, and claims based on such witnesses are made seemingly without regard to the trial counsel's actual investigation and the basis for his strategic decisions.

Hendrix was examined by one psychologist several years before the murders and by two psychologists between the time of the murders and his trial. Hendrix

9

III, 908 So.2d at 422. In this appeal, neither Hendrix nor the State contends that the evaluations or findings of two of those experts are particularly helpful to its side of the argument.

The evaluation and findings of the third expert, Dr. Henry Krop, are another matter. He is a respected forensic psychologist who frequently testifies for the defense on mental state mitigating circumstances in Florida capital cases. See, e.g., Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1284–85 (11th Cir. 2005); Robinson v. Moore, 300 F.3d 1320, 1328–29 (11th Cir. 2002); Kight v. Singletary, 50 F.3d 1539, 1542 (11th Cir. 1995). He was appointed by the trial court to evaluate Hendrix's mental state at the time of the offense. Id. at 421. The order of appointment called on Dr. Krop to issue a report to defense counsel containing a "description of the mental condition and mental impairment and its relationship to the actions and state of mind of the Defendant at the time of the offense."

This is how the state collateral court, which heard all of the evidence relating to this issue, summarized what trial counsel learned from Dr. Krop:

> Dr. Krop interviewed the Defendant after his arrest. According to trial counsel, when he consulted with Dr. Krop, the doctor told him that during his interview with Mr. Hendrix, Mr. Hendrix disclosed, in cold, clear detail, how and why he had murdered the victims. Dr. Krop advised counsel that these were cold, calculated acts that were not the result of any mental defect; that Mr. Hendrix was in clear

10

command of his faculties at the time of the offenses; and that Mr. Hendrix made a clear, conscious decision to kill because he did not want to go back to prison. . . . Further, Dr. Krop indicated he could offer no professional opinion that would be helpful. The recitation of the events of the murders as told to Dr. Krop comported with the description and admission the Defendant had made to trial counsel.

Hendrix III, 908 So. 2d at 421 (quoting the trial court findings); see also id. at 418–19; Hendrix I, 637 So. 2d at 918 & n.2 (listing the witnesses trial counsel did call at the penalty stage and the mitigating circumstances he established). The Florida Supreme Court's decision that counsel's investigation into mental health mitigating circumstances and his decision not to call Dr. Krop to testify on any issue at the penalty stage were reasonable is not contrary to, or an unreasonable application of, Supreme Court precedent. Nor are any of that court's other decisions rejecting Hendrix's penalty stage ineffective assistance of counsel claims.

Finally, a COA was issued on whether the State's failure to disclose that one of its witnesses had been a confidential informant for a drug task force a few years before the trial violated Hendrix's rights under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Both the state collateral trial court and the Florida Supreme Court rejected this claim on the grounds that this undisclosed fact was not material, which under Brady means that Hendrix has failed to show a reasonable probability of a different result had the fact been disclosed. Hendrix III, 908 So.

11

2d at 419, 423–25.

The witness in question was Roger LaForce. He was, as the state collateral court put it, "a jailhouse snitch" who testified about inculpatory statements that Hendrix had made to him while in jail. Id. at 423. The jury knew that LaForce was in jail at the time he testified, it knew that he was a snitch, and he candidly admitted to the jury that he was testifying against Hendrix in the hope that he would get something out of it. Id. at 424–25. In view of those facts any additional damage to LaForce's credibility stemming from the fact that he had served as a confidential informant in unrelated matters three years earlier is minimal. See id. at 424.

Not only that, but as the Florida Supreme Court put it, there was "[v]ast evidence" not only that Hendrix committed the murders but also that he did so with "heightened planning and premeditation." Hendrix I, 637 So. 2d at 920. The adjective "vast" is apt. Three witnesses each testified that, in separate instances, Hendrix had indicated that he was going to harm or kill Scott. Hendrix told the first one that "he had to do something" about the person who had "turn[ed] State's evidence against him." He told the second one that "he was going to kill" Scott. And he rhetorically asked the third one: "Wouldn't it be a shame if Elmer [Scott] didn't show up for court?" Another witness testified that Hendrix had threatened

12

Scott. More specifically, he heard Hendrix tell Scott: "I'm going to be tearing up some mother fucken ass, your ass, mother fucker. I will tear up your ass. If you do this or you do that, I will tear up some ass, I promise you that." Added to the testimony of those four witnesses, four others testified that Hendrix had asked them about getting him a firearm; two of them recalled that he wanted a throw-away gun.

In addition to those eight witnesses, Hendrix's girlfriend testified that he had discussed with her his plans to kill Scott. She described to the jury that she had driven Hendrix to Scott's house the night before Hendrix's trial on the burglary charges was to begin; that she waited outside and heard shots; and that after she drove Hendrix home, he took a shower and burned his clothes. She also conveyed to the jury Hendrix's blow-by-blow description of the two murders, including how he had slashed Scott's throat "for, I guess, insurance" and how, as he shot Scott, he told him "I'll see you in hell!" Id. at 918.

The Florida Supreme Court's decision that the undisclosed information was not material, and for that reason there was no Brady violation in this case, is an entirely reasonable application of Brady and other Supreme Court precedent applying that decision.

**AFFIRMED.**

13