Thomas Warren Whisenhant was first convicted and sentenced to death in 1977 for the rape and murder of Cheryl Lynn Payton, which occurred in Mobile County. The facts of the murder are set out in Whisenhant v. State, 370 So.2d 1080 (Ala.Cr.App. 1979), *Page 237 
and the statement of facts in that opinion is adopted by this Court as if fully set out herein.
Whisenhant's first trial was conducted in Jefferson County, after a motion for change of venue was granted by the trial judge. The Court of Criminal Appeals reversed the conviction because of improper argument by the prosecutor. In 1981, Whisenhant was retried, this time in Mobile County, and was again convicted and sentenced to death. The Court of Criminal Appeals affirmed his conviction, but reversed his sentence because the prosecutor, in his opening statement at the sentencing phase, accused Whisenhant of having committed other crimes, evidence of which had not been introduced during trial. This Court then granted cross-petitions for certiorari and remanded to the Court of Criminal Appeals for a determination of whether the prosecutor's remarks were harmless error. The Court of Criminal Appeals ruled that the remarks were harmless error and thereby affirmed the sentence. On return from remand, this Court held that the error caused by the prosecutor's remarks was not harmless and remanded the case to the Court of Criminal Appeals with instructions that the case be remanded to the trial court for a new sentencing trial. After remand by the Court of Criminal Appeals, Whisenhant received another sentencing trial, and the jury recommended that he be given the death penalty. The trial court accepted the jury's recommendation and sentenced Whisenhant for the third time to death by electrocution. The Court of Criminal Appeals affirmed the sentence and we, by this opinion, affirm the judgment of the Court of Criminal Appeals.
Whisenhant raises the following issues:
 (1) Was the trial judge's refusal to recuse himself a violation of the defendant's constitutional rights?
 (2) Did the trial court commit reversible error by refusing to change the venue of the trial from Mobile County?
 (3) Did Attorney General Siegelman violate the constitutional rights of the defendant when he called a press conference to discuss the case 15 days before trial?
 (4) Was the trial court in error when it disqualified a veniremember because of her hesitancy to impose the death penalty?
 (5) Did the prosecutor commit reversible error when he referred to the appeals process in closing argument?
 (6) Did the trial court improperly refuse to give the defendant's requested jury instructions on nonstatutory mitigating circumstances?
 (7) Did the admission of testimony of the victim's mother violate the defendant's constitutional rights?
 I. MOTION TO RECUSE
Circuit Judge Ferrill McRae presided over the first and second sentencing trials and, in each case, accepted the jury's recommendation that Whisenhant be sentenced to death. Judge McRae also presided over the third sentencing trial.
Prior to the third sentencing trial, Judge McRae responded as follows to a motion in limine by the defendant regarding the admissibility of certain evidence offered by the state:
 "THE COURT: Yeah, you know, Mr. Dees, you and I both have tried this case a number of times. I think it would be putting a stranglehold on the State that I shouldn't do and I think it even goes back to your insanity question. The victim in this case, as I recall the evidence, was abducted with Entebbe precision and he certainly has to — you know, which an irrational person I do not believe could have formed. But he is — he's in the position — you're asking me to put the State in the position of not telling the jury the entire story. So, I can't do that. So, I deny that motion."
Based on these remarks, the defendant immediately made a motion for recusal, arguing that the judge had a fixed opinion regarding the mitigating circumstance of a capital offense "committed while the defendant was under the influence of extreme mental or emotional disturbance," Code 1975, §13A-5-51(2), or a capital offense *Page 238 
committed when the defendant could not "appreciate the criminality of his conduct" or "conform his conduct to the requirements of the law," Code 1975, § 13A-5-51(6).
The statements by the trial judge did not provide grounds for recusal. Rather, they occurred in response to a motion by the defendant to prohibit the family of Cheryl Lynn Payton from testifying. His comments were a reflection of his knowledge of the case and reflected no personal enmity. To disqualify a judge for bias, the bias must be shown to be personal. Ex parteLarge, 501 So.2d 1208, 1210-11 (Ala. 1986). A search of the record reveals no personal bias on the part of the trial judge towards the defendant.
In addition, the fact that the trial judge had presided over the defendant's previous two sentencing trials was not grounds for disqualification. A trial judge need not recuse himself solely on the ground that he was the "same trial judge who had heard the case and imposed the death penalty" in a defendant's prior trial. Ex parte Whisenhant, 482 So.2d 1241, 1245 (Ala. 1983).
 II. CHANGE OF VENUE
The defendant argues that the trial judge committed reversible error by refusing to change the venue of the trial; that for the same reasons the original trial was moved to Jefferson County from Mobile County, this trial should also have been moved; and that a high percentage of those living in Mobile County were predisposed to favoring the death penalty because of unfavorable publicity in the Mobile area regarding this case.
Code 1975, § 15-2-20(a), states the following:
 "(a) Any person charged with an indictable offense may have his trial removed to another county, on making application to the court, setting forth specifically the reasons why he cannot have a fair and impartial trial in the county in which the indictment is found. The application must be sworn to by him and must be made as early as practicable before the trial, or it may be made after conviction upon a new trial being granted."
To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. Murphy v. Florida,421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643,6 L.Ed.2d 751 (1961).
In 1977, the publicity surrounding the the murder of Cheryl Lynn Payton and the ensuing trial of Thomas Whisenhant was very intense. However, 10 years had passed from the time of the murder to the third sentencing trial. This 10-year period is significant, because it allowed the details of the case to fade from the minds of potential jurors. "That time soothes and erases is a perfectly natural phenomenon to all." Patton v.Yount, 467 U.S. 1025, 1033, 104 S.Ct. 2885, 2889,81 L.Ed.2d 847 (1984). From the record, it is obvious that the passage of 10 years had dulled the memories of most of the veniremembers. The record reveals that although many jurors had a rudimentary knowledge of Whisenhant and what he had done, very few remembered whether he had received a sentence of life imprisonment or of death. Those who did remember the sentence were properly excused by the trial court.
 III. STATEMENTS OF THE ATTORNEY GENERAL
Fifteen days before this third sentencing trial, Attorney General Don Siegelman called a press conference in Mobile. The press conference received extensive media coverage and was preceded by the issuance of a press release, which was circulated to the Mobile news media. At the press conference, Siegelman announced that an attorney from his office (Tom Sorrells) was joining the Mobile district attorney to "make this retrial the last one for Thomas Whisenhant." Siegelman said that he had *Page 239 
instructed the state's attorneys to seek the death penalty because "there are some crimes that are so outrageous and offend the moral standards of society to such an extent that capital punishment is an appropriate penalty. This is clearly such a case."
The trial court, through careful questioning, was able to determine that all but one veniremember could not remember the attorney general's statements. The one veniremember who did remember them was excused by the trial judge. Therefore, we find that the attorney general's press conference did not deprive the defendant of his due process rights.
 IV. QUESTIONING OF PROSPECTIVE JURORS
At the sentencing trial, the court allowed the defendant to question prospective jurors individually about what they knew about the specific facts of the defendant's previous trials. The defendant admits that individual voir dire was allowed, but contends that the court was unduly restrictive in not allowing him to question prospective jurors about the effect of pre-trial publicity on their ability to sentence the defendant in an impartial manner.
The jurors were also interviewed in panels of 12; during that process the defendant was restricted from asking questions about pre-trial publicity in front of these 12-member panels. This was done to ensure that these panels would not be tainted by the statement(s) of a single juror.
To those who had heard of the case from the media, Judge McRae then stated the following:
 "Has any member of this jury seen anything about this case on television, read anything about this case in the newspaper or seen or heard anything about this case on television and, if so, please stand. All right.
". . . .
 "Is there any member of this jury who thinks because of the recollection that you have about this case, whether it be from the radio, television or newspaper, that it would be impossible for you to sit as a fair and impartial juror in this penalty stage of this particular case? That is, what you have read, what you have seen or seen and heard on television, would that in any way bias or affect you in any way from rendering a fair and impartial verdict in this case? If you feel that it would, simply raise your hand."
Having reviewed the record, we agree with the Court of Criminal Appeals "that the trial court asked all the questions necessary to insure that the jurors would give this appellant a fair and impartial trial." Those jurors who felt that they could not listen impartially, those who knew of Attorney General Siegelman's press conference, and those who knew that the defendant had received the death penalty in a prior trial were excused from the venire. Therefore, we agree with the Court of Criminal Appeals that the defendant had a fair and impartial jury and that the trial court was correct in refusing to change the venue of the trial.
 V. JUROR KAREN STEADHAM
The defendant argues that the trial court committed reversible error when it excused juror Karen Steadham from the venire. After being asked about her ability to impose the death penalty, Steadham responded as follows:
 "JUROR: I really — it's not my place to tell somebody they should die.
"THE COURT: Well, you —
 "JUROR: I mean, you know, as far as the electric chair and other people sitting down and telling somebody — you send them to the electric chair, they — as far as I'm concerned, the Lord did not — he don't want you to kill people and if I tell you all to go and kill him, I might as well take him outside and shoot him in the head.
"THE COURT: Okay. Any other questions?
"MR. DEES: Are you opposed to the death penalty?
 "JUROR: I don't care if somebody else tells him to go, but myself, I'm not *Page 240 
going to go and sit in the jury and say send him to the death sentence.
"MR. DEES: I see.
 "JUROR: But also our jails are too crowded for him to sit in our jails. So, I don't know what you all are going to do with him.
"MR. GALANOS: Are you through, Morris?
 "If there might be a situation where you might have to decide what to do with him, and what we're trying to find out is if you were selected as a juror in this case, if you were one of the twelve people that's going to decide this man's fate, would you automatically because of your feelings about religion and the death penalty, would you automatically vote to impose a sentence of life without parole, regardless of what the facts were and regardless of what the law may be? Life without parole or death by electrocution, because you're going to be limited to those two choices.
 "JUROR: I guess I'll have to say yes, because — I don't know. You all say you're not supposed to kill, but if I tell you all that, then I just might as well — I'm doing the same thing.
 "MR. GALANOS: Okay. So, I want — you said your answer was yes. Does that mean yes, you would automatically vote to impose a penalty of life without parole, but not death by electrocution?
"JUROR: Mm-hm.
 "MR. GALANOS: Well, thank you for your candor, because as Mr. Dees said, all we're asking folks to do is just tell us how they feel.
 "THE COURT: Well, look, I know you feel like you're getting grilled by all these folks, but I'm going to have to ask you one more question now. Okay?
"JUROR: Yes, sir.
 "THE COURT: Are you telling me that if the facts were presented to you that — and you listened to the facts and circumstances, that you would automatically go in, if you were on the jury, and vote for life in prison without parole? You would not even consider death by electrocution?
 "MR. CARNES: I'd like to object to His Honor's question on the grounds that it's not the test under (inaudible).
 "THE COURT: Well, that's the way I'm going to ask it.
 "JUROR: Well, I'm not sure. Myself, I don't believe that I should go up there and tell them to kill him, but he did it to somebody else. I mean, you know, I'm not sure.
 "MR. GALANOS: Can I ask you this, Karen, and again I'm not trying to give you a hard time, just trying to find out how you feel. If you're chosen to sit on this jury and if the facts are such that the State proves what we call aggravating circumstances — those would be circumstances which indicate or tend to indicate that the appropriate punishment is death by electrocution — and those aggravating circumstances in your heart and in your mind outweigh what are called mitigating circumstances — that would be evidence that Mr. Dees would put on that would indicate or tend to indicate that the appropriate punishment should be life without parole. But if the aggravating circumstances, circumstances in favor of the death outweigh mitigating circumstances, could you — and then after the Judge charges you on the law of the case, could you vote to impose the penalty of death by electrocution as opposed to life without parole?
 "JUROR: I don't know. To me, I guess (inaudible) it has to be done.
 "MR. GALANOS: But it's not a question of what they would do, it's a question of what you would do.
 "JUROR: That's what I said. I don't know what I would do. I hope I don't have to be in the situation, I'll tell you now."
The proper test for determining whether a prospective juror may be removed for cause for her views on capital punishment is whether her views would "'prevent or substantially impair'" her from properly performing her duties as a juror. Wainwright v.Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841
(1985), quoting Adams v. Texas, *Page 241 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). The defendant contends that Steadham's views on capital punishment could not be determined with certainty. However, a blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror.
 "Veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror."
Wainwright, 469 U.S. at 423-26, 105 S.Ct. at 851-54.
Based on Karen Steadham's responses, we find that her views on capital punishment made her "unable to faithfully and impartially apply the law." Therefore, the trial court was correct in excluding her from the venire.
 VI. PROSECUTOR'S CLOSING ARGUMENT
The defendant argues that the prosecutor, in his closing argument, "improperly minimized the jury's sense of responsibility for determining the appropriateness of a death sentence" by arguing the following:
 "They told you he helped law enforcement and you saw the F.B.I. agent on there, a Mr. Boyle. What did he actually tell you? He actually told you that he gets — all this about this center starting because of Tommy Whisenhant. He actually told you he got a letter from up there at F.B.I. headquarters, find us somebody, and what was the criteria? The criteria is he's got four murders and his appeals are exhausted. Well, his appeals aren't exhausted. He talks to Mr. Dees and he talks to Tommy Whisenhant. Mr. Dees said, Whisenhant made the decision, made it himself, but he did make the decision, and he says he couldn't have anything to gain. He didn't have anything to gain? He's in this courtroom right now trying to get you to consider that, and he was aware this hearing was coming up. That means Tommy Whisenhant himself knows he had something to gain and he had something to gain by doing it and he, with good common sense, decided to do it. Now, Mr. Boyle told you after they filled out that questionnaire they sent it off and he's never heard from it again. He didn't tell you this big foundation was started because of that. He didn't tell you some center was started because of that, but he did tell you something that was significant as to why Tom Whisenhant would appear and answer that questionnaire and also give a deposition in court in that civil case. He enjoyed the attention. He hadn't talked to anybody for a while. He liked folks making a fuss over him."
The State contends that it was not attempting to minimize the jury's role in the capital sentencing process, but was responding to the following arguments by the defendant that the jury should find Whisenhant's participation in an F.B.I. study of multiple murderers to be a mitigating circumstance:
 "Secondly, we're talking about the fact that Thomas Whisenhant has done something since he's been in prison that you can consider as a valid mitigating circumstance, that he has made an effort to help law enforcement when he dealt with the F.B.I., and you heard the F.B.I.'s testimony.
". . . .
 "Now, let's talk about Tommy Whisenhant helping law enforcement. You heard an F.B.I. agent say, first of all, that he is not an expert and he couldn't tell you whether Tommy was sane or insane. He said, I'm not a psychiatrist. He said, he acted like a rational man when I was talking to him. Well, nobody *Page 242 
doubts that. That's a red herring, if you believe him acting like a rational man makes a difference.
 "Tommy gave evidence in 1982, six hours of interview to the National Center for Violent Crime, and you heard the F.B.I. agent tell you how that was important. You know what, you know how Tommy Whisenhant was caught? Think about how important it was. Tommy was caught because he went back to the scene. Now, let's just suppose his report was in the evidence that he gave, and let's say the Mobile Police Department came upon a mutilated body like this, they fed it into that computer real quick and tied it in to the National Center for the Prevention of Violent Crimes and they popped it back and they said there's some things you need to think about. They'll tell a few and one of them was, he'll probably return to the scene, because they would have put that he cut on the body while it was dead. Do you know what, the first murder, Mrs. Hyatt, Mrs. Payton may still be. All they'd had to have done was stake out the scene. That's what — that's what the purpose of that program is, to find what these people do and then that's why it's valuable.
 "Now, Tommy — are you going to penalize Tommy Whisenhant now because he participated in a program and say, well, that's self-serving. He just did that to help himself. You didn't hear the F.B.I. agent say that and Tommy didn't have to do that. He participated in that and hopefully it will mean something and hopefully they will come — they will be able to come back and get some information from Tommy later, because you heard the F.B.I. agent say that the study wasn't complete, and I asked him the question on that tape. I said, Doctor — I mean I said, Agent Boyle, now, suppose you find out some information from one guy and find out some from another and you need to go re-interview somebody. He said, it's possible.
 "And Dr. Brown and Dr. Kimbrough said we need more information from Tommy Whisenhant. I'll tell you, if he's alive ten years from now, other Paytons may be saved, because you can see how that the Mobile Police Department found a dead body that had been cut on and the F.B.I., the first thing that center would tell them, stake out the scene. Mr. Whisenhant would be long [sic] — we wouldn't have this trial and Mrs. Payton would be alive."
It is clear that the State was responding to the defendant's participation in the F.B.I. survey rather than attempting to minimize the jury's sense of responsibility.
 "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."
United States v. Young, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043,84 L.Ed.2d 1 (1985).
As the Court of Criminal Appeals pointed out, "the prosecutor was attempting to point out that this appellant did not fit the proper criteria for the F.B.I. study and, thus, his cooperation was self-serving in that it may be considered a nonstatutory mitigating circumstance on appeal." Whisenhant v. State,555 So.2d 219 (Ala.Crim.App. 1988). We agree with the Court of Criminal Appeals' finding that the prosecutor's arguments were not improper.
 VII. REQUESTED JURY INSTRUCTION # 10
At the sentencing trial, the defendant requested that the court give his proposed jury instruction # 10, listing the nonstatutory mitigating circumstances that he felt were supported by the evidence at trial:
 " — First, that [petitioner] had psychological and emotional problems when he committed the capital offense;
 " — Second, that [petitioner's] early family history contributed to his conduct;
 " — Third, that [petitioner] has made efforts to assist law enforcement;
 " — Fourth, that [petitioner] has made efforts to help the victim's family; and
 " — Fifth, that [petitioner] has made a good adjustment to life in prison." *Page 243 
The trial judge gave the following instructions to the jury regarding nonstatutory mitigating circumstances:
 "In addition to the mitigating circumstances I have just read to you, you may also consider as a mitigating circumstance the circumstances of the capital offense which tend to indicate that the Defendant should not be sentenced to death. This includes, but is not intended [sic] to, anything that happened to the Defendant before he committed the capital offense that indicates or tends to indicate that he should not be sentenced to death. Mitigating circumstances also include, but are not limited to, any conduct or behavior of the Defendant since the time of the capital offense which indicates or tends to indicate that he should not be sentenced to death. Mitigating circumstances also include, but are not limited to, any aspect of the Defendant's mental or emotional condition at the time of the crime which indicates or tends to indicate that the Defendant should be sentenced to life imprisonment without parole instead of death. A mitigating circumstance does not have to be included in the list which I have read to you in order for it to be considered by you.
". . . .
 "The law of this State recognizes that it is possible, in at least some situations, for a large number of aggravating circumstances to be outweighed by one or a few mitigating circumstances. In other words, the law contemplates that different circumstances may be given different weights or values in determining what sentence is to be given to a particular circumstance in light of all the other circumstances in this case. You must do that in the process of weighing the aggravating circumstance or circumstances against the mitigating circumstance or circumstances in order to determine the proper sentence."
The Eleventh United States Circuit Court of Appeals requires that the trial judge do the following when instructing the jury on mitigating circumstances in a death penalty case:
 "(1) instruct the jury that it must consider mitigating evidence, (2) define mitigating factors and explain their function in sentencing deliberations, and (3) inform the jurors that a finding of aggravating circumstances does not require them to return a death sentence."
Tucker v. Zant, 724 F.2d 882, 891 (11th Cir. 1984).
The trial court's instructions satisfied the requirements ofTucker. Therefore, we find that the trial court did not commit error by denying the defendant's requested jury instruction # 10.
 VIII. TESTIMONY BY THE VICTIM'S MOTHER
At the sentencing trial, the judge allowed the victim's mother, Vivian Gazzier, to testify regarding the fear her daughter had felt because of two other convenience store murders in the Mobile area during the two years preceding her daughter's murder. Mrs. Grazzier testified that her daughter had turned in her resignation on the day she was murdered because of the fear she felt. The defendant argues that the trial court committed error in admitting Gazzier's testimony because, he argues, the testimony was not relevant to any aggravating circumstances proffered by the State and was inadmissible hearsay. The trial court admitted the mother's testimony, based on the following reasoning:
 "The Section 13-11-6(8) aggravating circumstance does exist. The Defendant did not suddenly kill Cheryl Lynn Payton without her having an opportunity to suffer the anticipation of her death at the hands of a murderer. Instead, the Defendant abducted her; he drove her to an isolated spot; because it was raining, he raped her in the cab of his pickup truck so he would not get wet; he marched the terrified victim out of the truck; and he shot her to death. Cheryl Lynn Payton knew that two other female convenience store clerks in Mobile had been murdered in the preceding year. She knew that the more recent victim had been abducted and that after she had been killed, her body had been mutilated. Cheryl Lynn Payton was afraid that she, too, would be abducted and murdered. As she was being abducted, as she was being taken to an isolated spot, as she was being raped, and as she was taken from the Defendant's truck, Cheryl Lynn *Page 244 
Payton was terrified. She had reason to know that she was going to die long before the Defendant actually killed her. Considering all the circumstances, this capital offense was especially heinous, atrocious and cruel. The heinousness, atrociousness, and cruelty in this capital offense exceeded by far that which is present in every capital offense."
In order for a trial court to find that a murder was heinous, atrocious, and cruel, the crime must be of such a nature that it is "conscienceless or pitiless" and "unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981).
The defendant argues that this case is analogous to that ofBooth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440
(1987), and that the judgment must, therefore, be reversed. We disagree. In Booth, an elderly Baltimore, Maryland, couple were brutally stabbed to death by the defendant Booth and an accomplice. Before the sentencing phase of the trial, the State Division of Parole and Probation interviewed the victims' son, daughter, son-in-law, and granddaughter. These interviews were then compiled into a "Victim Impact Statement" (V.I.S.) The V.I.S. included very emotional statements by those interviewed and spoke of the many fine qualities of the deceased. The Division of Parole and Probation official who interviewed the survivors concluded the report by writing:
 "It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them."
Id., 482 U.S. at 498-99, 107 S.Ct. at 2531-32.
The prosecutor in Booth, over defense counsel objections, read the V.I.S. to the jury. The jury sentenced Booth to die for one of the murders and to life imprisonment for the other murder. The United States Supreme Court overturned the capital conviction, holding that the introduction of the V.I.S. violated the Eighth Amendment. Id., 482 U.S. at 504,107 S.Ct. at 2536.
The facts of this case differ markedly from those inBooth. Here, the testimony that the trial court relied on dealt not with the suffering Mrs. Gazzier had experienced since the murder, but rather the fear that Cheryl Lynn Payton experienced leading up to her murder. Unlike the jury in Booth, the trial court in this case relied on the emotions that Cheryl Lynn Payton felt, not the emotions felt by her survivors. In Booth, the Supreme Court overturned the conviction because the defendant had no control over the emotions that the surviving relatives felt. Here, the defendant surely was aware that, because of the recent crimes he had committed, a female convenience store clerk like Cheryl Lynn Payton would be afraid of being abducted, raped, and murdered.
We adopt, by reference, the language of the trial judge regarding this aggravating circumstance, and we conclude that his finding was proper.
In addition, the statements made by the victim's mother, although hearsay, were admissible because they were declarations of the emotion of fear. C. Gamble, McElroy'sAlabama Evidence, 262.01(11) (3d ed. 1977). The trial court, therefore, was correct in admitting the testimony of Mrs. Gazzier.
 VIII. CONCLUSION
This Court, having searched the record, finds no plain error or defect that adversely affected any of Whisenhant's substantial rights. *Page 245 
The record reveals no evidence that the sentence of death resulted from or "was imposed under the influence of passion, prejudice, or any other arbitrary factor." Code 1975, §13A-5-53(b)(1).
In addition, the sentence in this case is not disproportionate to the sentence imposed in similar capital punishment cases. Bradley v. State, 494 So.2d 750 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied,480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987) (rape/murder);Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App.), affirmed,437 So.2d 1356 (Ala. 1983), cert. denied, 465 U.S. 1051,104 S.Ct. 1329, 79 L.Ed.2d 724 (1984) (rape/intentional killing).
The trial court found that the following four aggravating circumstances existed (pursuant to Code 1975, §§ 13-11-6):
 "The Section 13-11-6(1) aggravating circumstance does exist. When the defendant committed the capital offense of raping and murdering Cheryl Lynn Payton on October 16, 1976, he was still under a twenty-year federal sentence of imprisonment he had received on March 14, 1966, for assault with intent to murder. He had been paroled on November 28, 1973, but for purposes of the Section 13-11-6(1) aggravating circumstance he was still, quote, under sentence of imprisonment, close quotes.
 "The section 13-11-6(2) aggravating circumstance also exists. The Defendant was previously convicted of three crimes which involve violence to the person, and any one of them is sufficient to establish this aggravating circumstance. In 1966, he was convicted for assault with intent to murder, as has already been discussed. In 1981, he pled guilty to and was convicted of two first degree murders, the 1975 murder of Patricia Hitt and the 1976 murder of Venora Hyatt.
 "The Section 13-11-6(4) aggravating circumstance does exist. The capital offense involved rape. The Defendant murdered Cheryl Lynn Payton after raping her.
 "The Section 13-11-6(8) aggravating circumstance does exist. [The trial court's discussion of the § 13-11-6(8) aggravating circumstance is quoted above.]"
The court found that no statutory mitigating circumstances existed. However, the court did find that the following nonstatutory mitigating circumstances existed:
 "The defendant was under some mental or emotional disturbance at the time of the crime, but it was not extreme. The fact that the Defendant was under some mental or emotional disturbance at the time of the crime will be and is considered as a nonstatutory mitigating circumstance.
". . . .
 "He is and was schizoid, which means he is detached.
". . . .
 "The defendant is and was paranoid, which means he has persecutorial delusions.
". . . .
 "He also has necro-sadistic tendencies, which means he likes to cut up on or abuse dead bodies. He displayed those necro-sadistic tendencies when he returned to Cheryl Lynn Payton's body the day after he murdered her and cut on it with a knife. The rape and murder of Cheryl Lynn Payton was not caused by the defendant's schizoid personality, or by his paranoid tendencies, or by his necro-sadistic desire. Nonetheless, the Court does and will consider those personality disorders as nonstatutory mitigating circumstances and give them such weight as they deserve."
Having independently weighed the evidence in the record, we feel that those nonstatutory mitigating circumstances found by the trial court deserve consideration. However, after consideration of these circumstances, we are of the opinion that the aggravating circumstances of the crime far outweigh the mitigating circumstances.
After review of the entire record, this Court is convinced that Thomas Warren Whisenhant received a fair trial; his sentence of death by electrocution for the murder *Page 246 
of Cheryl Lynn Payton is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.