[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 3, 2009
THOMAS K. KAHN
CLERK

_____

No. 04-15810

_____

D. C. Docket No. 02-00397-CV-WS-C

THOMAS WARREN WHISENHANT,

Petitioner-Appellant,

versus

RICHARD F. ALLEN,
Commissioner, Alabama
Department of Corrections

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(February 3, 2009)

Before EDMONDSON, Chief Judge, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

This is a death penalty case in which petitioner-appellant, Thomas Warren Whisenhant, appeals the district court's denial of his 28 U.S.C. § 2254 petition for federal habeas relief. Whisenhant raises four claims in this appeal: (1) his counsel was ineffective at his 1981 guilt phase trial for failing to present his only defense of insanity; (2) the state failed to disclose exculpatory evidence during the 1981 trial and a 1987 penalty phase trial; (3) the prosecutor's closing argument at the 1981 trial was fundamentally unfair; and (4) the trial judge's ex parte dealings with prosecutors prior to the 1987 penalty phase trial violated Whisenhant's due process right to an impartial judge. We conclude that the district court properly denied habeas relief and AFFIRM.

## I. BACKGROUND

On a rainy night in October 1976, Whisenhant abducted 24-year-old Cheryl Lynn Payton at gunpoint from a convenience store in Theodore, Alabama, where she was working alone.[1] Whisenhant drove her to a remote area, raped her in his truck, and then took her into the woods where he shot her in the head, killing her. He later returned twice to the woods and mutilated Payton's body with his knife. After police officers apprehended him, Whisenhant confessed to the rape, killing,

---

[1]A detailed statement of facts set forth in Whisenhant v. State, 370 So. 2d 1080, 1081-86 (Ala. Cr. App. 1979), was adopted by the Alabama Supreme Court in Ex Parte Whisenhant, 555 So. 2d 235 (Ala. 1989).

and mutilation of Payton.  He also confessed to killing within the past year two other female convenience store clerks and mutilating one of them.[2]

At the 1977 trial for Cheryl Payton's murder, Whisenhant presented numerous witnesses to establish an insanity defense.  In particular, a noted psychiatrist, Dr. Claude L. Brown, testified that Whisenhant had a mental disease and that he had lost the power to distinguish right from wrong when he had killed Payton.  Whisenhant, 370 So.2d at 1089.  The jury rejected the insanity defense, and Whisenhant was convicted and sentenced to death.  The Alabama Court of Criminal Appeals reversed his conviction, however, based on the prosecutor's improper closing argument and a fatal variance between the indictment and judgment.  Whisenhant v. State, 370 So.2d 1080, 1103 (Ala. Cr. App. 1979), cert. denied, 370 So. 2d. 1106 (Ala. 1979).

A second jury trial was held in 1981.  Prior to trial, Whisenhant's attorneys filed a motion for $3500 to hire two psychiatrists who had evaluated Whisenhant before the 1977 trial, and a more general motion for funds for expert witnesses.  The trial court denied the first motion and granted the statutory cap of $500 for the second motion.  Whisenhant's counsel firmly believed the trial court committed

---

[2]Whisenhant pled guilty in 1981 to the first-degree murders of Venora Hyatt and Patricia Hitt and received a sentence of life without parole for each offense.

reversible error by denying Whisenhant's motion for funds for the psychiatrists, and decided not to present any evidence of insanity. Whisenhant was again convicted and sentenced to death.

On appeal, Whisenhant raised the perceived error of the trial judge's denial of his motion for funds, but the Alabama Court of Criminal Appeals found no constitutional violation. Whisenhant v. State, 482 So. 2d 1225, 1228-30 (Ala. Cr. App. 1982). Although the Alabama court affirmed his conviction, it reversed his death sentence based on the prosecutor's improper opening statement at the sentencing phase, which mentioned other crimes allegedly committed by Whisenhant that were not introduced at trial. Id. at 1239-40. After further appellate review, the Alabama Supreme Court declared the error was not harmless and remanded the case for a new sentencing trial. Ex Parte Whisenhant, 482 So. 2d 1247, 1249 (Ala. 1984) (per curiam).

In 1987, a third penalty phase proceeding occurred. At this proceeding, Whisenhant again presented evidence of mental illness but a jury unanimously voted to sentence Whisenhant to death for the third time. The Court of Criminal Appeals affirmed the death sentence, as did the Alabama Supreme Court. Whisenhant v. State, 555 So. 2d 219 (Ala. Cr. App. 1988); Ex Parte Whisenhant v. State, 555 So. 2d 235 (Ala. 1989). The United States Supreme Court denied

4

Whisenhant's petition for writ of certiorari. Whisenhant v. Alabama, 496 U.S. 943, 110 S. Ct. 3230 (1990).

Whisenhant then began state habeas corpus proceedings by filing an Alabama Rule of Criminal Procedure Rule 32 petition. During discovery, Whisenhant received two FBI reports made after the murder of Venora Hyatt, which provided speculative profiles about the unidentified killer. Whisenhant also discovered a statement made to police officers by his co-worker Sandra Heverly who described Whisenhant as "weird." R1-14, Exh. Vol. 39 at 362-67. Based on these documents, Whisenhant amended his complaint in 1995 to include a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

Shortly before the Rule 32 hearing in October 1996, Whisenhant discovered a draft order granting Whisenhant's motion for funds to hire a psychiatrist. Prior to the 1987 trial, prosecutor Chris Galanos had given this proposed order to the trial judge, Circuit Judge Ferrill D. McRae, but not to defense counsel. Judge McRae entered an order the next day similar to the draft order but increased the amount of funds to $2,200. Based on this discovery, Whisenhant added a claim of judicial bias to his state habeas petition and moved to recuse Judge McRae from the Rule 32 proceedings. Judge McRae granted the motion for recusal "out of an abundance of caution and to avoid all appearance of impropriety." R1-14, Exh.

5

Vol. 36 at 319. After the Rule 32 hearing, Judge Braxton Kittrell denied the habeas petition in its entirety. The Alabama Court of Criminal Appeals affirmed the denial in an unpublished memorandum. The Alabama Supreme Court denied Whisenhant's petition for a writ of certiorari.

Having exhausted state court post-conviction remedies, Whisenhant filed a federal habeas petition pursuant to 28 U.S.C. § 2254. In a detailed 81-page order, the district court analyzed each of Whisenhant's fourteen claims before denying habeas relief. Whisenhant filed a motion for a certificate of appealability (COA), which the district court denied in part and granted on four grounds: (1) whether the trial court's denial of his motion for funds to employ psychiatrists prior to the 1981 guilt phase trial violated Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985); (2) whether the prosecution's failure to disclose two FBI profiles and Sandra Heverly's statement until after the 1987 penalty phase trial violated Brady; (3) whether the inclusion of venire members at the 1981 trial who knew that Whisenhant had been convicted at his 1977 trial violated Irvin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639 (1961); and (4) whether the trial judge's ex parte dealings with prosecutors prior to the 1987 penalty phase trial concerning the proposed order for funds violated In re Murchison, 349 U.S. 133, 75 S. Ct. 623 (1955).

Whisenhant then filed in this court an application for a COA on two of his denied claims: (1) ineffective assistance of counsel at the 1981 guilt phase trial for failure to present an insanity defense, and (2) prosecutorial misconduct at the 1981 trial based on the prosecutor's closing argument that no co-worker had testified Whisenhant was insane. We granted a COA on these two issues.

In his § 2254 appeal brief, Whisenhant states he has dropped the issues of whether the trial court's denial of his motion for funds violated Ake, and whether the jury composition violated Irvin. Because he does not raise these claims in his brief to us, these claims are abandoned. See Hendrix v. Secretary, Florida Dep't. of Corr., 527 F.3d 1149, 1154 (11th Cir. 2008) (per curiam). We turn now to his remaining four claims for habeas relief.

## II. DISCUSSION

A. Claim of Ineffective Assistance of Counsel

Whisenhant contends that he received ineffective assistance of counsel at his 1981 guilt phase trial because his attorneys failed to present any evidence that he was insane. He concedes that this decision was strategic - counsel believed the trial judge's denial of their motion for funds for psychiatrists was a locked-in error that would be disturbed if they presented evidence of insanity. Whisenhant argues that this strategy was unreasonable, however, in light of the voluminous evidence

7

from the 1977 trial and his prior medical records. Morever, Whisenhant asserts that he was prejudiced by his attorneys' deficient performance because there was a reasonable probability of a different result had they presented the 1977 trial evidence, coupled with the two FBI reports and Sandra Heverly's statement that the state should have disclosed.

In order to obtain federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Whisenhant must show that the state court decision adjudicating his claims (1) was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedents, or (2) unreasonably determined the facts in light of the evidence presented in the state courts. 28 U.S.C. § 2254 (d). The first prong means that a state court identified the correct governing legal principle but unreasonably applied it to the facts of a petitioner's case. Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 2534-35 (2003). To satisfy this standard, the state court's application must have been "'objectively unreasonable,'" not just incorrect or erroneous. Id. (quotation omitted).

The state habeas court and the Alabama Court of Criminal Appeals correctly analyzed Whisenhant's claim under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Strickland requires the petitioner to show both that his counsel's performance was deficient, and that the deficiency prejudiced his defense. 466

8

U.S. at 687, 104 S. Ct. at 2064.   Both state courts found that trial counsels' strategy was reasonable, and that the result of the proceeding would not have been different if evidence of insanity had been presented.

An attorney's performance is deficient if the acts or omissions of counsel, in light of all the circumstances and facts of the particular case fall "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  The Supreme Court cautioned appellate courts not to second-guess counsel's assistance, noting how easy it is to view counsel's performance as unreasonable after an unsuccessful defense.  Id. at 689, 104 S. Ct. at 2065.  "Even the best criminal defense attorneys would not defend a particular client in the same way." Id. at 689, 104 S. Ct. at 2065. To counteract the distorting effects of hindsight, the defendant bears the burden of overcoming a strong presumption that the challenged action is sound trial strategy.  Id. at 689, 104 S. Ct. at 2065.

Whisenhant concedes that his trial attorneys made a strategic decision not to present any evidence of insanity but argues that this decision was unreasonable. Whisenhant argues that because trial counsel could have presented evidence of insanity, he should have.  He asserts that trial counsel could have subpoenaed Dr. Brown, could have called a former police officer to testify about Whisenhant's behavior as a youth, could have read into evidence testimony and medical reports

9

introduced at the 1977 trial, could have used the $500 granted by the trial court to hire experts instead of obtaining a serologist's report, and could have presented Whisenhant's federal prison medical records. Because this evidence was available to trial counsel, Whisenhant argues that it was unreasonable not to use it.

Whisenhant's argument ignores the fact that his attorneys' decision was made after substantial investigation into plausible lines of defense. Morris Dees, an experienced lawyer who founded the Southern Poverty Law Center, was lead counsel in all three of Whisenhant's trials. After investigating the case prior to the 1977 trial, he concluded insanity was Whisenhant's best defense. Dees felt that psychiatric testimony would be the linchpin because Whisenhant's mental illness would not be readily apparent to his friends and neighbors. Dees had serious doubts that jurors at the 1981 trial would accept an insanity defense, however, because "this was a case in their backyard where women were being killed and left dead all around the county." R1-14, Exh. Vol. 38 at 213-14. Unlike the first trial which was held in another county, the 1981 trial was held in the same county the murder had occurred. Dees's assisting trial counsel, John Carroll, also doubted that a jury would accept an insanity defense based on the jurors' strong reactions at the 1977 trial to the horrific details of the murder. As a result, Dees felt that a jury surely would not find Whisenhant insane without live psychiatric testimony.

Dees believed it was "fundamentally unfair" and a violation of due process for the state not to provide an indigent with adequate funds for essential experts. R1-14, Exh. Vol. 38 at 216-17, 219. Dees's foresight proved correct when the Supreme Court decided in Ake that, pursuant to the Fourteenth Amendment's due process guarantee of fundamental fairness, the state must assure access to a psychiatrist if an indigent defendant's sanity is likely to be a significant factor in his defense. Ake, 470 U.S. at 74, 83, 105 S. Ct. at 1091-92, 1096. Although Ake was decided four years after the 1981 trial, Dees was aware of literature and laws at that time supporting his views, and he investigated the issue of the state's obligation to provide funds for an indigent. Based on his research, Dees believed the trial court's denial of the motion for funds for a psychiatrist was a "locked-down, lead-pipe, four-square" error in the record. R1-14, Exh. Vol. 39 at 327. Once an error is locked down, Dees explained his trial strategy is to "leave it there because, you know, the idea is to give your client a fair trial; and if the State has messed up by committing an error, then you would be guilty of malpractice if you didn't win on that error." R1-14, Exh. Vol. 38 at 272.

After the trial court denied his motion for funds for a psychiatrist, Dees decided not to present any evidence of insanity. This is why he did not subpoena Dr. Brown to testify or pay Dr. Brown's fee out of his own pocket. Dees also

11

considered but rejected the idea of reading into the record the testimony and reports of witnesses from the 1977 trial. Whisenhant's sister could no longer testify at the 1981 trial because of emotional problems, and Dees believed that her dramatic, emotional testimony at the 1977 trial would not be evident from merely reading her prior statements. Moreover, Dees felt that reading testimony into the record from the experts or their reports would have been "virtually useless" when the state was presenting live witnesses. Id. at 228-29. He also decided not to call Captain Bryant as a witness because his lay opinion about things that happened when Whisenhant was a child would serve little or no purpose without the psychiatric testimony. Given that the $500 granted by the trial court was insufficient to cover the fees for Dr. Brown testifying at trial, Whisenhant decided instead to use the money to test the victim's undergarments for sperm. Dees hoped to find evidence that Whisenhant did not rape the victim, which would provide a critical defense to the charge of capital murder.

In light of all these circumstances, trial counsel's decision not to present any evidence of insanity was a sound trial strategy that "falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Trial counsel made an informed, reasonable judgment after thoroughly investigating the law and facts relevant to Whisenhant's case. Such strategic

choices are "virtually unchallengeable." Id. at 690, 104 S. Ct. at 2066. The state courts' decisions that counsel's performance was not deficient comports with Supreme Court precedent.

Because Whisenhant has failed to satisfy the first requirement of Strickland, he cannot succeed on a claim of ineffective assistance of counsel and we, therefore, need not address whether counsel's performance prejudiced the defense. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."). Habeas relief is denied on this claim.

B. Brady Claim

A COA was also issued on whether the State's failure to disclose two FBI profile reports and a statement by Sandra L. Heverly violated Whisenhant's rights under Brady. Both the state habeas court and the Alabama Court of Criminal Appeals determined that the undisclosed documents were not material, which under Brady means that Whisenhant has failed to show a reasonable probability of a different result had the documents been disclosed. United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). The Supreme Court has clarified that a defendant need not show he would have received a different verdict with the

13

evidence, but rather that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995). In determining whether the defendant received a fair trial, a court should consider the suppressed evidence "collectively, not item by item" since "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 434, 436-37, 115 S. Ct. at 1567.

The FBI reports were generated to assist authorities in finding the unknown killer of Venora Hyatt, who was murdered about six months before Cheryl Payton. The first report, based on crime scene photographs, speculates that "[i]f perpetrator is truly schizophrenic, initial attack would probably have taken place in or around the store and would have been both sudden and fatal." R1-14, Exh. Vol. 39 at 356. The second report references the autopsy results and opines that the probable subject suffers from simple schizophrenia and has usually been in contact with the victim on a number of previous occasions. The third undisclosed document is a statement by Sandra Heverly, a co-worker who dated Whisenhant for a few months in 1974. Heverly stated that Whisenhant would wiggle his feet when watching television and giggle even though nothing was funny; his eyes would sometimes get "glassy looking"; he would watch her drive and "grin up a storm"; he was

14

"weird"; and all the people who used to work with him at the ship yard "knew how weird he was." Id. at 363-67.

With respect to the materiality of these three documents at the 1981 guilt phase trial, trial counsel testified that he would not have used them given his strategic decision not to offer any evidence of insanity. Because the disclosure of these documents could not have affected the outcome of Whisenhant's 1981 trial, the Alabama Court of Criminal Appeals correctly determined that these documents were not material. Bagley, 473 U.S. at 682, 105 S. Ct. 3383.

Nor were the undisclosed documents material to the 1987 penalty phase trial. Whisenhant's counsel presented numerous witnesses at the 1987 trial who testified about Whisenhant's personality and mental state. Dr. Brown explained in detail how Whisenhant's troubled childhood and domineering mother resulted in a history of violence against women. Dr. Brown diagnosed Whisenhant as a schizoid personality with a mental disease that people around him in daily life would be unlikely to notice given its episodic manifestations. Dr. Brown's conclusions were corroborated by another expert, Dr. Tanay, whose report was read partly into evidence. In summarizing the insanity evidence presented, the district court found that "the defense constructed a detailed mosaic of evidence advancing its position that Whisenhant was under the duress of an extreme mental disturbance, that he

15

was unable to appreciate the criminality of his conduct, and that he otherwise suffered from psychological and emotional problems when he raped and murdered Payton." R1-22 at 34.

In light of all the evidence at the 1987 penalty trial, the marginal value added by the two FBI profile reports and Heverly's statement would not have "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566. The FBI reports were speculative profiles involving a different victim that included opinions which both matched and did not match certain aspects of Whisenhant's character and his murder of Cheryl Payton. At best, they would have been cumulative of some of Dr. Brown's expert testimony. Likewise, Heverly's lay opinion that Whisenhant was weird would not have significantly bolstered Dr. Brown's testimony. This is especially true given that Heverly's descriptions contradict Dr. Brown's opinion that Whisenhant's co-workers would not readily notice any strange behavior. It is thus highly unlikely that disclosure of these documents would have changed the outcome of the 1987 trial. The Alabama Court of Criminal Appeals' decision reasonably applied Brady and its progeny in determining that the undisclosed information was immaterial and that no Brady violation occurred.

16

C.  Prosecutorial Misconduct Claim

Whisenhant next challenges the prosecutor's closing argument at his 1981 guilt phase trial that no co-worker testified Whisenhant was insane.  In his closing argument, the prosecutor remarked as follows:

> If these three fine criminal defense lawyers had found any doctor, any friend, any co-worker, anyone that knew the Defendant and they said he was insane, don't you think you would have heard from them?  You haven't heard a word, and these three lawyers are very very good.  Nobody has come in here and said that Tommy ran around eating dirt, did they, running naked and jumping on women at bus stops and that he was insane.  No.  The reason is simply this, they couldn't find anybody to say it.
>
> Mr. CARROLL: Objection, Judge that's not true.
>
> THE COURT: He has a right to argue his inferences.

R1-14, Exh. Vol. 16 at R618-19.  At the same time the prosecutor made this statement, Whisenhant alleges the prosecutor knew the state had deceptively suppressed co-worker Sandra Heverly's statement that Whisenhant was weird.  Whisenhant asserts that the prosecutor biased the jurors against a finding that Whisenhant was mentally ill and deprived him of the opportunity to object to the improper statement, thereby violating his due process rights under Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464 (1986).

In Darden, the Supreme Court recognized that a defendant's due process right to a fair trial is not infringed by a prosecutor's remarks that are "undesirable

17

or even universally condemned." 477 U.S. at 181, 106 S. Ct. at 2471 (citation and punctuation omitted). Instead, the comment must have infected the trial with such unfairness that the conviction constitutes a denial of due process. Id. at 181, 106 S. Ct. at 2471 (citation and punctuation omitted). Any challenged remarks must be evaluated in context based upon the defense argument that preceded it. Id. at 179, 106 S. Ct. at 2470. Where the "objectionable content was invited by or was responsive to the opening summation of the defense," a reviewing court must determine the comment's effect on the trial as a whole. Id. at 182, 106 S. Ct. at 2472.

As in Darden, the prosecutor's challenged comment here was responsive to the defense's closing argument and did not misstate the evidence. Whisenhant's attorney argued that Whisenhant was insane, as evidenced by the brutal facts of the murder, and Whisenhant's confession that he did not know why he killed the victim and could not control his actions. The prosecutor then responded by pointing out that no co-workers had testified Whisenhant was insane. This comment did not misrepresent Heverly's statement, which never characterized Whisenhant as insane, only "weird." R1-14, Exh. Vol. 39 at 365. Heverly denied that Whisenhant ever threatened her, used any violence against her, or even made any sexual advances toward her. Moreover, Heverly lost contact with Whisenhant in 1975 and his

18

allegedly strange behavior occurred while they were dating in 1974, approximately two years before Cheryl Payton's murder in 1976. Based on the foregoing, the Alabama Court of Criminal Appeals correctly found that the prosecutor's argument was correct because the "behavior described by Sandra Heverly clearly fell short of insanity." R1-14, Exh. Vol. 42, R44 at 4.

Whisenhant argues that the prosecution's suppression of Heverly's statement precluded him from objecting to the improper statement. As noted, however, Whisenhant's attorney did object to the prosecutor's comments that the defense could not find anybody to say Whisenhant was insane, but the trial judge overruled the objection as a permissible argument. In light of the overwhelming evidence of Whisenhant's guilt and defense counsel's tactical decision not to present any evidence of insanity, the likelihood that the jury's decision was influenced by the prosecutor's isolated comment is minimal. See Darden, 477 U.S. at 182, 106 S. Ct. at 2472 (heavy weight of evidence against petitioner reduced the likelihood that an improper closing argument influenced the jury).

Viewing the trial as a whole, we conclude the prosecutor's invited response about the lack of insanity testimony by a co-worker did not render Whisenhant's trial fundamentally unfair. See United States v. Frazier, 944 F.2d 820, 825-26 (11th Cir. 1991) (no due process violation where defense invited prosecutor's

rebutting argument and there was overwhelming evidence of defendant's guilt).

Whisenhant is, therefore, not entitled to habeas relief on his claim of prosecutorial misconduct.

D.  Claim of Judicial Bias

In his final claim for habeas relief, Whisenhant asserts that the trial judge's bias and his appearance of partiality at the time of the 1987 penalty phase trial violated In re Murchison, 349 U.S. 133, 75 S. Ct. 623 (1955).  Specifically, Whisenhant alleges that Judge McRae had an ex parte communication with the prosecution before the 1987 trial in order to cover up a potential error that occurred in the 1981 trial.  This purported scheme between Judge McRae and the prosecution deprived him of his constitutional right to an impartial judge.

Prior to the 1987 penalty phase trial, Whisenhant filed a motion for funds for a  psychiatrist.  Chris Galanos, the Mobile County District Attorney in 1987, gave Judge McRae a draft order granting that motion.  Galanos attached a handwritten cover note stating that the order "enumerates facts intended to preclude Ake error during the guilt stage, but I am not sufficiently familiar with the facts to determine the accuracy of the order.  Let me know what you want to do."  R1-14, Exh. Vol. 36 at 314.  After making some minor revisions and increasing the amount of the

funds from $2000 to $2200, Judge McRae entered an order the next day granting Whisenhant's motion.

The state habeas court found that this claim was procedurally defaulted and, alternatively, lacked merit because even assuming the trial judge had ex parte communications with the prosecutor, the result was that Whisenhant received the money he had requested. The Alabama Court of Criminal Appeals only considered the claim on its merits. It found there was no evidence that the trial judge knew the motion was not served on the defense. There was also no potential error to be covered up because Judge McRae's denial of the 1981 motion for funds had already been affirmed on appeal before the draft order was submitted. See Whisenhant v. State, 482 So. 2d 1225, 1228-30 (Ala.Cr.App. 1982). Finally, the trial judge's order granted the funds Whisenhant had sought. Based on the foregoing, the Alabama Court of Criminal Appeals determined that Whisenhant failed to offer any evidence that the trial judge was personally biased or partial.

Whisenhant challenges the finding by the Court of Criminal Appeals that Judge McRae did not know the motion was not served on the defense. He claims this finding is based on an unreasonable determination of the facts in light of the evidence presented at the Rule 32 proceeding. Factual findings by a state court are presumed correct unless the appellant rebuts the presumption by clear and

21

convincing evidence.  See 28 U.S.C. § 2254(e)(1); Henyard v. McDonough, 459 F.3d 1217, 1240 (11th Cir. 2006) (per curiam), cert. denied, ___ U.S. ___, 127 S. Ct. 1818 (2007).  Whisenhant had a full and fair opportunity to present evidence on this issue at the state habeas hearing.  At that hearing, Whisenhant called as a witness Chris Galanos, who admitted he did not serve Whisenhant's trial attorneys with a copy of the draft order.  Whisenhant did not ask Galanos whether he told Judge McRae that fact, however.  Nor did Whisenhant call Judge McRae as a witness.  Although the habeas judge stated that Judge McRae should only be called as a witness if "absolutely essential," the habeas judge did not forbid Whisenhant from doing so.  R1-14, Exh. Vol. 37, State Habeas Corpus Hearing on 24 October 1996 at 1-2.  Without Judge McRae's testimony, we can only speculate as to what he knew and did not know.  The burden was on Whisenhant to prove his claimed violation, and he has failed to do so.  See Hendrix, 527 F.3d at 1153 (state court's finding was a reasonable determination of the facts where petitioner failed to present evidence at the state habeas hearing to support his claim).  Thus, Whisenhant has not presented clear and convincing evidence to rebut the presumption of correctness afforded to the state court's factual finding.

Even if Judge McRae had known that the defense did not receive a copy of the draft order, Whisenhant has failed to establish a constitutional violation.  To the

22

extent that Whisenhant argues that Judge McRae's "appearance of partiality" violates his due process rights, we have held that "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision." Id. at 1153; see also Davis v. Jones, 506 F.3d 1325, 1336-37 (11th Cir. 2007) (no due process violation where petitioner claims only an appearance of partiality and not actual bias). Thus, in so far as Whisenhant claims the trial court's ex parte actions created an appearance of partiality, we conclude that the state courts' rejection of Whisenhant's claim of judicial bias was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. See 28 U.S.C. § 2254 (d)(1).

With respect to Whisenhant's claim of actual bias, he fares no better. It is long established that "[a] fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. at 136, 75 S. Ct. at 625. The Supreme Court has identified various situations in which "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464 (1975). Such cases include those in which the judge has a pecuniary interest in the outcome or has been personally abused or criticized by the party before him. Id.

None of the cases cited by Whisenhant are analogous to his own. In re Murchison involved a judge acting under state law as a one-man grand jury who later charged the witnesses with contempt based on their grand jury testimony, then tried and convicted them. 349 U.S. at 134-35, 75 S. Ct. at 624-25. The judge based his judgment of contempt on his own personal knowledge and impressions of what had occurred in the grand jury room, including his opinions that the witness was insolent and defiant, even though the judge's opinions could not be cross-examined. Id. at 138, 75 S. Ct. at 626. The Supreme Court held that it was a violation of due process for "a judge to act as a grand jury and then try the very persons accused as a result of his investigations." Id. at 137, 75 S. Ct. at 625.

Three other cases cited by Whisenhant also involved criminal contempt proceedings in which the Court held that a judge other than the one reviled by a contemnor should decide the contempt issue. In Offutt v. United States, 348 U.S. 11, 12, 75 S. Ct. 11, 12 (1954), a trial judge repeatedly clashed with defense counsel throughout a 14-day trial, ending in a finding of criminal contempt against trial counsel, which the Supreme Court reversed. In concluding that the trial judge was biased and not impartial, the Supreme Court emphasized that this was "not a rare flareup," but rather a "continuous wrangle on an unedifying level between the two." Id. at 17, 75 S. Ct. at 15. Likewise, in Taylor v. Hayes, 418 U.S. 488, 501,

24

94 S. Ct. 2697, 2705 (1974), a running controversy between the trial judge and defense counsel escalated during a 10-day trial to the point that the trial judge's "mounting display of an unfavorable personal attitude toward petitioner, his ability, and his motives" had left personal stings on both sides. In contrast, the trial judge in Mayberry v. Pennsylvania, 400 U.S. 455, 465-66, 91 S. Ct. 499, 505 (1971), was not "an activist seeking combat" like the judge in Offutt or Taylor. Nevertheless, the defendant's cruel slanders so vilified the trial judge that the judge "necessarily becomes embroiled in a running, bitter controversy," requiring a new judge to preside over a contempt proceeding. Mayberry, 400 U.S. at 466, 91 S. Ct. at 505.

It is clear that the judicial bias cases cited by Whisenhant involve totally different facts from his own case. There is no evidence that Judge McRae was involved in a "running controversy" with Whisenhant or Whisenhant's attorneys. Neither side made personal attacks against the other, and Judge McRae never displayed an inappropriate or hostile attitude toward the defense. Moreover, the order granting Whisenhant's motion for funds benefitted the defense. The cover letter by Chris Galanos does not establish that Judge McRae was in cahoots with the prosecution, nor that he signed the order granting the motion for funds in order to protect against a potential Ake error in the 1981 trial. As the district court adroitly concluded,

25

Under the circumstances, Whisenhant's accusations of a judicial/prosecutorial conspiracy in a smoke-filled backroom are not credible where the "conspiracy"'s object was an unremarkable order that gave the defense exactly what they wanted and made accurate observations about evidence available to the defense in earlier proceedings. Had a "conspiracy" truly been hatched, the [c]ourt suspects it would not have been used as a vehicle to grant a defense motion and make uncontroversial observations about evidence available in 1981. If Judge McRae and Galanos had *ex parte* dealings regarding the psychiatrist order, such interactions, without more, are in no way symptomatic of the kind of prejudice, hostility and antagonism required to support a finding of judicial bias.

R1-22 at 58 n.71. Based on a thorough review of the record, we conclude that the Alabama courts' denial of Whisenhant's judicial bias claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. We therefore deny relief on this claim.

### III. CONCLUSION

Whisenhant filed this appeal seeking federal habeas relief from his second conviction and third death sentence for the 1977 murder of Cheryl Payton. We hold that Whisenhant received effective assistance of counsel at his 1981 trial because trial counsel made a reasonable, strategic decision not to present evidence of insanity. In addition, the FBI profile reports and a co-worker's statement were not material to either the 1981 guilt phase trial, where no evidence of insanity was

26

presented, or to the 1987 penalty phase trial, where abundant evidence of mental illness was presented. The prosecutor's closing argument that no co-worker had testified that Whisenhant was insane did not misstate the evidence and properly responded to the defense's closing argument. Finally, the trial judge did not evince bias or partiality against Whisenhant when it signed an order prior to the 1987 trial granting Whisenhant's motion for funds for a psychiatrist. As Whisenhant is not entitled to relief on any of his claims, the judgment of the district court is AFFIRMED.